# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SOL DAVIS, INDIVIDUALLY AND AS TRUSTREE OF THE SOL DAVIS RETIREMENT PLAN, ET AL. | : : : |
| | : |
| PLAINTIFFS, | : |
| | : CIVIL ACTION NO. 3:10cv261(VLB) |
| | : |
| v. | : |
| | : |
| CONNECTICUT COMMUNITY BANK, N.A. ONWER OF WESTPORT NATIONAL BANK DEFENDANT. | : MARCH 26, 2013 : : |

## MEMORANDUM OF DECISION DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. #178] AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT [DKT. #185] AND DENYING AS MOOT PLAINTIFF'S MOTON FOR PATIAL SUMMARY JUDGMENT [DKT. # 181] AS TO DEFENDANT'S FIRST COUNTERCLAIM

This is an action filed against Connecticut Community Bank, N.A. ("CCB") as owner of Westport National Bank ("WNB") (collectively referred to herein as the "Bank") arising out of the Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff").  Plaintiffs have brought this action alleging WNB's mismanagement of custodial accounts Plaintiffs maintained with WNB in order to meet the asset value threshold to qualify to open an account with Bernard L. Madoff Investment Securities, LLC ("BLMIS").  After Madoff admitted his fraud, the Plaintiffs realized that their investments were lost and they commenced this action.  The Plaintiffs have brought claims against the Bank for (1) breach of contract, (2) breach of fiduciary duty, (3) negligence, (4) violations of Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen. Stat. §42-110b, (5) unjust enrichment, (6) conversion, (7) civil theft, and (8) fraud.  The Plaintiffs have moved, pursuant to Federal Rule

of Civil Procedure 56, for partial summary judgment on one of their breach of contract claims, on the Bank's eighth affirmative defense for unjust enrichment and the Bank's first counterclaim for unjust enrichment.  [Dkt. #178].   WNB has moved for partial summary judgment on several of Plaintiffs' breach of contract, breach of fiduciary duty, CUTPA, conversion, civil theft and fraud claims.  [Dkt. #185].  For the foregoing reasons the Court DENIES Plaintiffs' partial motions for summary judgment and DENIES IN PART AND GRANTS IN PART Defendant's partial motion for summary judgment.

<u>Background</u>

In December 2008, when Madoff admitted his Ponzi scheme and BLMIS collapsed, the Plaintiffs had been investors with BLMIS for up to two decades, and WNB had served as custodian of their investment accounts with BLMIS since 1999, having succeeded the original custodian bank.  The Plaintiffs opened custodial accounts with the original custodian bank which pooled the proceeds of the accounts and opened a single investment account with BMLIS.  When WNB succeeded the original custodian, each Plaintiff entered into a custodial agreement with WNB who became the legal owner of the BMLIS account for the benefit of the Plaintiffs.  The gravamen of the Plaintiffs' claims is that, during its time as custodian, WNB breached its contractual and common law custodial duties to the Plaintiffs by impermissibly commingling their assets, relying on information provided by BLMIS and making no effort to monitor BLMIS or verify this information.  In addition, the Plaintiffs take issue with the Bank's handling of the customers' contributions and redemptions.   WNB administered the custodial

**2**

services accounts in a manner which minimized the number of transfers which took place between WNB and BLMIS; when a customer deposited cash, WNB adjusted that customer's *pro rata* interest in the common pool of assets invested with Madoff but typically did not send the money to BLMIS.  Instead, the money stayed in the custodial services account in order to fund distributions and fee payments.  Plaintiffs argue this practice resulted in the improper use of one customer's contribution to fund another's redemptions and fees.

This action is one of three related actions against the Bank by investors who maintained custodial accounts with the Bank for the purpose of pooling their funds to qualify to invest their assets with BLMIS.  *See Levinson et al v. PSCC Svc Inc. et al*, 3:09-cv-269 and *Short et al v. Connecticut Community Bank NA*, 3:09-cv-1955.  The Plaintiffs in all three actions have brought substantially identical claims on identical facts and evidence.  This Court has already ruled on cross-motions for summary judgment in both the *Levinson* and *Short* matters.  Both the Plaintiffs and the Bank have acknowledged that the facts and evidence presented in the present matter are essentially identical to the facts and evidence, which the Court considered in *Levinson*.  *See* [Dkt. #219, Pl. Mem. p. 57] (noting that the Court in *Levinson* ruled on "identical facts"); [Dkt. #191, Def. Mem. p.14-15] (arguing that the Court's reasoning in *Levinson* applies equally to the present case).  Indeed, much of the parties' arguments either expressly adopt the Court's rationale in its decision in *Levinson* or attempt to distinguish the claims asserted in the present matter from the claims asserted and ruled upon in *Levinson*.  As the parties principally rely on this Court's decision in *Levinson* and have

accepted the facts as found in *Levinson*, this Court hereby adopts the facts as articulated in the *Levinson* decision.  For the convenience of the parties, the Court has attached to this ruling a copy of its decision in *Levinson*.  See *Levinson et al v. PSCC Svc Inc. et al*, 3:09-cv-269, Docket no. 457.

In its motion for summary judgment, the Bank acknowledges that the Court's ruling in *Levinson* applies to the present matter.  See *Levinson et al v. PSCC Svc Inc. et al*, 3:09-cv-269(VLB), 2012 WL 4490432 (D. Conn. Sept. 28, 2012).  Therefore, the Bank has declined to move for summary judgment on the identical claims which survived summary judgment in *Levinson* and has moved for summary judgment based on the Court's rationale in *Levinson* on the identical claims which did not survive summary judgment.   In *Levinson*, the Court granted summary judgment in favor of the Bank on the plaintiffs' breach of contract claims based on (i) WNB's administration of the custodial clearing accounts through the comingling of funds and (ii) WNB's alleged breach of Paragraph 7 of the Custodian Agreement.  *Levinson*, 2012 WL 4490432.  The Court found there were triable issues with respect to the plaintiffs' (i) breach of contract claim based WNB's calculation of fees based on "assets"; (ii) breach of contract claim based WNB's failure to maintain adequate records and statements; (iii) breach of fiduciary duty claim based on WNB's investment discretion; (iv) breach of fiduciary duty claim based on WNB's calculation of fees; and (v) negligence claim.   In addition, the Court granted summary judgment in favor of the Bank on one of Plaintiff's CUTPA claims but denied it on their other CUTPA claim.  Lastly, the Court granted summary judgment in favor of plaintiffs on their unjust

enrichment claim.   As will be discussed further below, the *Levinson* plaintiffs'
CUTPA and unjust enrichment claims significantly differ from the *Davis* Plaintiffs'
claim and therefore the Court's analysis in *Levinson* is inapplicable to the present
matter on those claims.

<u>Legal Standard</u>

The standard for deciding the cross-motions for summary judgment is
familiar.  Summary judgment is appropriate only when "the movant shows that
there is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  No genuine disputes as to
any material fact exist, and summary judgment is therefore appropriate, when
"the record taken as a whole could not lead a rational trier of fact to find for the
non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.
574, 587 (1986).  A material fact is one which "might affect the outcome of the suit
under the governing law," and an issue is genuine when "the evidence is such
that a reasonable jury could return a verdict for the nonmoving party."  *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  But "[c]onclusory allegations will
not suffice to create a genuine issue."  *Delaware & Hudson Ry. Co. v.
Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990).

On cross-motions for summary judgment, the same standard applies.  *See
Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "The court must
consider each motion independently of the other and, when evaluating each, the
court must consider the facts in the light most favorable to the non-moving

party."  *Natural Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003) (citing *Morales*, 249 F.3d at 121).

<u>Analysis</u>

A. Breach of Contract

As noted above, the Bank has declined to move for summary judgment on the Plaintiffs' identical breach of contract claims as in *Levinson*.  Therefore in the present matter, the *Davis* Plaintiffs' identical breach of contract claim grounded on WNB's calculation of fees based on BMLIS's reported assets values and their breach of contract claim based WNB's failure to maintain adequate records and statements remain extant for trial.  The Bank has moved for summary judgment based on the Court's rationale in *Levinson* as to the *Davis* Plaintiffs' identical claims for breach of contract based on WNB's administration of the custodial clearing accounts through the comingling of funds and (ii) WNB's alleged breach of Paragraph 7 of the Custodian Agreement.  For the same reasons as articulated in *Levinson*, the Court grants summary judgment on these two breach of contract claims.  *Levinson*, 2012 WL 4490432, at *6-12.

The *Davis* Plaintiffs' assert three additional breach of contract claims that they claim differ from the claims asserted in *Levinson*.  These theories are largely premised on the Plaintiffs' contention that it was improper for the Bank to administer the accounts in a manner which minimized actual physical transfers of funds between WNB and BLMIS by adjusting a customer's *pro rata* share in the omnibus account at BLMIS each time a contribution was made and then using

that contribution which was placed into a commingled account to fund redemption and fee payments.  The Court will examine each of these theories in turn.

In Connecticut,[4] a breach of contract action requires the plaintiff to show (1) a valid agreement, (2) performance by one party, (3) breach of the agreement by the opposing party and (4) damages directly and proximately caused by the breach.  *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 504, 890 A.2d 140 (2006).

In determining whether breach has occurred, the court must ascertain the contractual rights and obligations of the parties.

> In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . .  Where the language is unambiguous, we must give the contract effect according to its terms. . . .  Where the language is ambiguous, however, we must construe those ambiguities against the drafter. . . . [A] contract is unambiguous when its language is clear and conveys a definite and precise intent . . . .  The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity . . . .  Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous . . . .  In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself . . . .  [A]ny ambiguity in a contract must emanate from the language used by the parties . . . .  The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so . . . .  If the language of

---

[4] **None of the parties dispute that Connecticut substantive law applies to the Custodian Agreements.**

the contract is susceptible to more than one reasonable
Interpretation, the contract is ambiguous.

*Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn.
254, 260-61, 14 A.3d 284 (2011) (quoting *Cantonbury Heights Condominium Ass'n,
Inc. v. Local Land Development, LLC*, 273 Conn. 724, 734, 873 A.2d 898 (2005)).
Where a contract term is ambiguous, the court may properly discern the intent of
the parties as to the meaning of the contract by considering extrinsic evidence.
*United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 675, 791 A.2d
546 (2002). "[T]he test of proximate cause is whether the defendant's conduct is
a substantial factor in bringing about the plaintiff's injuries." *Gurguis v. Frankel*,
93 Conn. App. 162, 168, 888 A.2d 1083 (2006). "Proximate cause is ordinarily a
question of fact." *Id.*

  i.  Misappropriating Contributions

  Plaintiffs argue that they are entitled to partial summary judgment requiring
WNB to return the account contributions to the extent those contributions were
never sent to BLMIS.  [Dkt. #179, Pl. Mem., p.12].  The Plaintiffs argue that the
Custodian Agreement did not authorize the Bank to use one customer's
contributions to pay another customer's redemption requests and fees.  *Id.*
According to Plaintiffs, Paragraph 3 of the Custodian Agreement unambiguously
provided that WNB was not permitted to do anything with the contributions
except invest them in the Bank's money market account and transmit the funds to
WNB's account at BLMIS for investment.  *Id.* at 13.  Plaintiffs further argue that
even if the Custodian Agreements themselves standing alone can be deemed

ambiguous as to whether WNB was permitted to commingle plaintiffs' contributions and use them to pay others that interpretation is barred by WNB's Internal Revenue Sode Form 5305 Agreements which forbade commingling and guaranteed nonforfeitability of each plaintiff's contributions.  *Id.* at 20.  Plaintiffs point to the following provision of Form 5305 in support of their argument: "[n]o part of the custodial accounts may be invested in life insurance contracts, nor may the assets of the custodial account be commingled with other property except in a common trust fund or common investment fund."  *Id.* at 20-21.

The Bank argues that Form 5305 does not impose any duties on WNB beyond those imposed in the Custodian Agreement and therefore argues that the Plaintiffs cannot rely on Form 5305 in support of their breach of contract claim. [Dkt.#216, Def. Mem., p. 27].  The Bank reasons from this Court's prior analysis in *Levinson* holding that Section 408 of the Internal Revenue Code, upon which Form 5305 is based, did not impose any duties on WNB.  *Id.*  The Bank also emphasizes there is no private right of action for violations of Section 408.  *Id.*  In response, the Plaintiffs clarify that they are not asserting a claim based on Section 408 but argue that Form 5305 imposes contractual duties on the Bank. According to Plaintiffs, the Form 5305 Agreement, in and of itself, constituted a contract between them and the Bank.  The Plaintiffs contend that they asserted a claim for breach of Form 5305 independent of their claim for breach of the Custodian Agreement in their amended complaint.  [Dkt. #219, Pl. Mem., p. 14]. Although it's unclear whether the Plaintiffs' allegations clearly state a separate claim for breach of the Form 5305 Agreements, the Court will assume it did so for

purposes of its summary judgment analysis.  The Bank argues that regardless of whether the Plaintiffs' theory is grounded in a breach of the Custodian Agreements or Form 5305, it fails for the same reasons as articulated by this Court in granting summary judgment on the *Levinson* plaintiffs' claim for breach of contract based on the allegedly improper commingling of funds.  *Levinson*, 2012 WL 4490432, at *6-11.

Plaintiffs contend their theory is distinct from the *Levinson* plaintiffs' breach of contract theory based on the commingling of funds.  Plaintiffs argue that their claim is based on different conduct by WNB causing different loss. [Dkt. #219, Pl. Mem., p.6].  First, Plaintiffs argue their claim is different because they "do *not* contend that WNB was required to send their contributions to BLMIS or that they sustained a loss *because their money was sent to BLMIS*."  *Id.* (emphasis in the original).  Instead, they claim "that WNB was required to hold their funds in its deposit money market account pending transmittal to BLMIS." *Id.*  Despite Plaintiffs' word play just like the *Levinson* Plaintiffs, they do contend that WNB was required to send their contributions to BLMIS.   Second, Plaintiffs emphasize that their claim is different because they assert that WNB was not authorized to use funds that were not sent to BLMIS to pay other customers' redemptions and custodial fees.  *Id.*  The Plaintiffs further argue that because those funds were never sent to BLMIS such funds could not have been stolen by Madoff and contend that the Bank actually stole their funds.  They therefore argue they are entitled to receive back those contributions that were never sent to BLMIS.

Plaintiffs' breach of contract theory ignores the fungibility of cash and standard banking practice.  It is predicated on a notion that cash is a unique and not an interchangeable good.   Their theory requires the conceptualization of the Bank as being required to hold funds in the custodial account as though they were safety deposit boxes containing the actual dollars deposited pending their investment at BLMIS.   Plaintiffs reason that because the actual cash deposited with the Bank by the Plaintiffs was not physically transferred to BLMIS or kept in the Bank's money market account, but instead was used to pay redemptions to other custodial account holders instead of making withdrawals from the BMLIS account to fund redemptions and pay custodial fees, the Bank misappropriated those funds and thus they are entitled to a return of those particular funds.  However as Defendants point out, cash is an inherently fungible good.  *See Towers Charter & Marine Corp. v. Cadillac Ins.* Co., 894 F .2d 516, 523 (2d Cir. 1990) ("money is the quintessential fungible"); *U.S. v. Perez*, 426 F.2d 1073, 1080 (2d Cir. 1970) ("Money, of course, is a classic fungible commodity").   As the Third Circuit explained, "[w]hen money is deposited in a bank the depositor does not cease owning the money because the actual dollars and cents it deposited are fungible and are used by other customers."  *Morton Intern., Inc.,v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 681 n.7 (3d Cir. 2003); *see also Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 195-96 (3d Cir. 1990) ("Legally as well as economically, money is fungible-if a debtor with $100,000 cash in its general coffers owes $10,000 to someone, there is no meaningful distinction among which of those dollars is actually paid to satisfy the debt."); *Genesee Wesleyan*

**11**

*Seminary v. U.S. Fidelity & Guaranty Co.,* 247 N.Y. 52, 55 (1928) (finding that a "special deposit" exists "where the duty of the depository is to hold, not the identical bills or coins, but an equivalent sum, to be kept intact, however, for the use of the depositor.").

The Bank's practice of adjusting a customer's *pro rata* interest in the common pool of assets when a customer deposited cash into the Bank's money market account and then using those funds to pay other customers' redemptions and fees did not result in the first customer ceasing to own the money deposited because the actual dollars and cents deposited were used by other customers. Contrary to the Plaintiffs' contention, its contributions were not misappropriated or stolen by the Bank because specific dollars and cents were not physically sent to BLMIS or just kept in the Bank's money market account.   Because cash is inherently fungible, the physical location of the specific dollars and cents deposited is immaterial.  What matters is that the Bank maintained records reflecting the entitlement of the customer to a specific sum of money, and it is undisputed that the Bank did in fact maintain such records reflecting each Plaintiff's contributions.  Because cash is fungible, when the Bank increased a customer's *pro rata* interest in the aggregate assets in response to that customer's contributions that was tantamount to a physical transfer of those funds.  Therefore those contributions were in effect transferred to the BLMIS account upon the adjustment of the Plaintiffs' *pro rata* share in the common pool of assets.  Further, the Custodian Agreements unequivocally contemplated that the Plaintiffs would not own specific dollars and cents in the omnibus account,

but rather provided that the Plaintiffs' would own a proportionate share of the aggregate total amount of assets in the account based on the sum of their contributions minus their redemptions.  The Custodian Agreement provides in relevant part:

> It is understood and acknowledged that the funds to the Principal which are transmitted to BLMIS will be transmitted together with funds of other persons or entities from whom the Bank is acting in a similar capacity; that the investment account of BLMIS will be under the name 'Westport National Bank'; that the funds of the Principal transmitted with BLMIS will be grouped with funds of other persons or entities for investment with BLMIS.

[Dkt. #184, Ex. A, ¶2].  It further provides that the "Bank shall maintain adequate recording indicating the ownership by the Principal of investments with BLMIS and held by the Bank as custodian" and that the "Bank shall render at least annually statements reflecting the property held by its custodian hereunder."  *Id.* at ¶¶4-5.  Therefore, the Bank's practice conformed to the language and intent of the Custodian Agreements and standard banking practices.

The fact that the Bank did not always physically transfer contributions and physically request funds from BLMIS to pay redemptions and fees is irrelevant in light of the fungible nature of cash.  Consequently, the Plaintiffs' breach of contract theory is not cognizable because the Bank *did* transfer the Plaintiffs' contributions to the omnibus account at BLMIS when it adjusted a customer's *pro rata* share to reflect the balance of that customer's interest in the aggregate assets.  Because cash is fungible, when the Bank adjusted a customer's *pro rata* share in the BLMIS account, increasing it by the amount of funds deposited, the

Bank actually transferred the customer's deposit to BLMIS.  By way of illustration, if one customer made a deposit of $200.00 and another customer requested a redemption of $100.00 on a day when a $100.00 custodial fee was due, WNB could either withdraw $200.00 from BMLIS distribute the redemption and pay the custodian fee and then deposit $200.00 with BLMIS.  Alternatively, it could adjust the depositor's account, increasing it to reflect the $200.00 deposit, forgo the  withdrawal and distribute $100.00 to the redeeming customer and apply the balance to pay the custodial fee.  Either way, the funds deposited by the investor would be properly credited to the BMLIS account.  Consequently, the customer whose BMLIS account balance was increased by the amount of the deposit no longer "owns" the cash deposit and consequently it is available to be used by the Bank to be applied to other permissible purposes, in this case, to fund customer redemptions and custodial fee payments.  The Plaintiffs' breach of contract theory is therefore incongruous with the fungible nature of cash and the concept of depository banking.[1]  Under the Plaintiff's theory the customer should

---

[1] In an analogous context, a bankruptcy court held that a trust beneficiary can recover its funds in a bankrupt trust even though trust res was fungible cash and commingled with non-trust res.  In *re Carrozzella & Richardson*, 255 B.R. 267 (Bankr.  D.Conn. 2000).  The *Carrozzella* court explained that in order to recover a beneficiary must be able to show substantial identification of trust funds and thus be able trace the trust res to recover.   The court commented that this "general rule under non-bankruptcy law, satisfaction of which becomes more difficult when the trust res is a fungible item – such as money – which has been commingled with identical property of others." *Id.* at 275.   However, the bankruptcy court concluded that the trustee's commingling of trust funds with non-trust funds was "far from fatal to a plaintiff-beneficiary's recovery of trust property" because substantial identification is possible where "funds can be traced into a specific, mass such as a bank account" despite commingling.  *Id.* The court held that substantial identification did not "require the physical identification of specific coins, bills and notes."  *Id.* This precedent underscores

be credited twice for a single deposit. The customer's account balance would be increased and the customer would still own the dollars deposited with the bank That is an untenable result and is unassailably not the parties' intent.

To the extent that Plaintiffs' breach of contract claim is not solely predicated on the Bank's alleged misuse of the Plaintiffs' contributions to pay redemptions and fees, the Plaintiffs have not shown that such a claim is not entirely duplicative of the claim that the Bank breached the Custodian Agreements by commingling funds that was addressed by this Court in *Levinson*. *Levinson*, 2012 WL 4490432, at *6-11.   The Plaintiffs go to great lengths to try to distinguish the Court's decision in *Levinson* by arguing that the Court's analysis in *Levinson* was predicated on the *Levinson* plaintiffs' theory that WNB breached the contract by failing to forward plaintiffs' contributions to Madoff while their theory is based solely on the misuse of contributions to pay fees and redemptions.  [Dkt. #237, Pl Mem., p.5].  However, this is a distinction without a meaningful difference.  Despite Plaintiff's contention, their claim that the Bank misappropriated their contributions is predicated on their interpretation of the Custodian Agreement and IRS Form 5305 as requiring the contributions be transmitted to BLMIS for investment and not commingled and used to pay redemptions and fees.   To suggest otherwise is disingenuous.  This Court sees no reason why its rationale in *Levinson* would not also apply with equal force to

---

that it is irrelevant that the Bank did not physically transfer Plaintiffs' contributions into the omnibus account at BLMIS but instead adjusted its recordkeeping such that the ownership of the funds could be traced into a specific mass which here was the omnibus account at BLMIS.

Plaintiffs' claim here and therefore adopts its prior rationale as articulated in *Levinson*. *Levinson*, 2012 WL 4490432, at *6-11.

In *Levinson*, the Court concluded that the Plaintiffs breach of contract failed because the Plaintiffs had failed to establish that the loss of Securities Investor Protection Act ("SIPA") insurance coverage was a damage proximately caused by the Bank's practice of commingling customer funds in its money market account.   *Levinson*, 2012 WL 4490432, at *10.  At one point in Plaintiffs' opposition memorandum, Plaintiffs appear to disavow reliance on the loss of SIPA insurance coverage as their claimed injury under their breach of contract claims.  See [Dkt. #219, Pl. Mem., p.6] (noting that the *Levinson* plaintiffs relied on the loss of SIPA coverage but that their "claim for damages is based on different conduct by WNB causing different loss.").   The Plaintiffs then dropped a footnote in their memorandum suggesting that they are seeking damages for loss of SIPA insurance only on their other claims.  *Id.* at 6 n.7 ("To the extent that plaintiffs here seek damages for loss of SIPA insurance on *other* of their Claims for Relief, plaintiffs address the basis for such recovery below.") (emphasis in the original). However Plaintiffs later in their memorandum outright argue that the Court's prior decision on SIPA was erroneous and contend that the loss of SIPA insurance coverage was the result of the Bank's manner of administering the accounts.  *Id.* at 16.  The Court will therefore address Plaintiffs additional arguments on SIPA although it's unclear if they are advancing those arguments in connection with their breach of contract claim or their other claims.

As in *Levinson*, the Plaintiffs here argue that the real reason they were denied SIPA coverage was because of the Bank's practice of commingling customer funds and the failure to transfer the "vast majority of funds into the custodial accounts at the bank to BLMIS." *Id.* at 17. As was the case in *Levinson*, the Plaintiffs' sole support for this assertion is that the *Levinson* Plaintiffs' counsel declares that he was orally told by the Madoff Trustee's counsel that this was the real reason for the denial as opposed to the formal written determination of the Trustee that was issued to the Plaintiffs in the Madoff Bankruptcy proceeding. As the Court held in *Levinson*, this evidence is patently inadmissible hearsay. Plaintiffs argue that it would be unfair not to credit such hearsay because they have gone to great lengths to obtain verification of the Trustee's rumored position, which they have not been able to obtain. Plaintiffs state that the Trustee has refused to submit to a deposition or provide a declaration to substantiate this statement and both the Bankruptcy Court and the District Court for the Southern District of New York have refused to allow the Plaintiffs to depose the Trustee as to his reasons for the denial. *Id.* However, Plaintiff cite to no authority to support their contention that their unavailing attempts to obtain this evidence in an admissible form converts hearsay into non-hearsay.

The Bank has interpreted the Plaintiffs' argument as a request for a continuance under Rule 56(d) to obtain discovery and noted that a continuance is only warranted where the party can show how the facts sought are reasonably expected to create a genuine issue of material fact. [Dkt. #238, Def.

Mem., p. 8-9].[2]  The Bank emphasizes that there could be no genuine issue of material fact as the Trustee's formal denial of the Plaintiffs' claim for SIPA insurance protection was solely based on the fact that the Plaintiffs did not have accounts at BLMIS.  Once again, Plaintiffs cite to no legal authority casting that conclusion into doubt.

Even if this Court considered the hearsay statement that would fail to create a genuine issue of material fact in dispute as the Bankruptcy Trustee's stated position, which is a part of the record in the Madoff Bankruptcy, is the legally operative grounds in the Bankruptcy proceeding.[3]  The Plaintiffs cite to no authority for their position and the Trustee's position is consistent with the scant authority in this circuit.  *SIPC v. Morgan, Kennedy & Co.,* 533 F.2d 1314 (2d Cir.1976) (holding that that where title to the trust assets was held by three trustees who were responsible for the management of the trust and the investment of its assets, the account with the brokerage house was held in the trustees' names, the names of the various employee beneficiaries did not appear on the brokerage house's books or records, and control over investment decisions was exercised solely by the trustees, who communicated regularly

---

[2] **Under Federal Rule of Civil Procedure 56(d) (formally Rule 56(f)) the party seeking discovery under Rule 56(d) "must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."** *Gualandi v. Adams*, **385 F.3d 236, 244 (2d Cir. 2004).**

[3] **The Plaintiffs in** *Davis and  Levinson* **have objected to the Trustee's denial of their SIPA claims in the Madoff bankruptcy proceedings.  Those objections are still pending before the Bankruptcy Court.** *See In Re Bernard L. Madoff Inv. Secs. LLC*, **Adv. Pro. No.08-01789(BRL), Docket Numbers 4110, 4111, and 4198.**

with the brokerage house with respect to all transactions, the employee beneficiaries did not qualify as individual customers entitled to SIPA insurance coverage.); *In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013) (holding that investors who invested in feeder funds which in turn invested in BMLIS were not customers for purposes of SIPA insurance protection based on the fact that the property was not held in their name, they  had no authority to make investment decisions, had no authority to deal with BLMIS.).  Therefore no finder of fact could conclude that the Trustee's denial of SIPA coverage was a harm directly or proximately flowing from the alleged breach.  Further, the Plaintiffs also argue that the risk of loss of SIPA coverage was a contemplated harm resulting from the alleged breaches of contract because SIPA coverage was contemplated as part of the arrangement to provide custodial services. [Dkt. #219, Pl. Mem., p.18].  Even if the Bank had not commingled funds and had physically transferred all contributions into the BLMIS account instead of adjusting customers' *pro rata* shares, as stated above it is questionable under Second Circuit precedent whether the Plaintiffs would be entitled to customer status under 15 U.S.C. §78fff in the first instance.  *See In Re Madoff*, 708 F.3d 433; *SIPC v. Morgan*, 533 F.2d at 1318.  Moreover, as the Plaintiffs have objected to the Madoff Trustee's determination of their SIPA claims and those objections are still pending before the Madoff Bankruptcy Court, there has been no final adjudication on their SIPA claims.  Only the Bankruptcy Court and not the Trustee may issue an order legally determining the Plaintiffs' rights under SIPA. Consequently, the Plaintiffs could not have suffered any damages as they have

not yet been denied SIPA coverage by the Bankruptcy Court.  The Plaintiffs'
assertion that the Bank's conduct in commingling funds and misappropriating
contributions proximately caused the denial of SIPA coverage is therefore
entirely conjectural.  For this reasons also, the Plaintiffs fail to establish they
suffered damages proximately caused by this alleged breach.

Plaintiffs also argue that the Court's analysis in *Levinson* is not applicable
here because unlike the plaintiffs in *Levinson* they have identified a non-
speculative damage proximately caused by the Bank.  Plaintiff argues that "WNB
admits it used plaintiffs' account contributions to pay fees and redemptions for
others, and also admits that this directly resulted in its inability to return those
funds to plaintiffs….there is nothing 'speculative' about plaintiffs damages."
[Dkt.#237, Pl Mem., p.6].  Plaintiffs contend that the damage flowing from Bank's
practice of using one customer's contributions to fund other customers'
redemptions and fees was the loss of that customer's contributions.  As
discussed above, the Plaintiffs did not lose their contributions because of the
Bank's practice.  Instead, all available customer contributions were sent to the
BLMIS account when the Bank adjusted the customers' *pro rata* shares in the
BLMIS account.  Because cash is inherently fungible, the Bank's practice did not
deprive the Plaintiffs of the use of their contributions.  Further as there is no
evidence that Madoff would have not funded redemption requests prior to the
unveiling of his scheme in 2008, had a customer requested an amount equal to
his or her contributions there is no likewise no evidence that the Bank would not
have funded that request by either using funds in the Bank's money market

account or requesting funds from the BLMIS account.  The Plaintiffs again have failed to establish they suffered damages proximately caused by the Bank's alleged breach of contract.

Moreover to the extent that the Plaintiffs' claim is predicated on IRS Form 5305, there is no evidence that the Plaintiffs suffered any adverse tax consequences.   The purpose of the IRS Form 5305 Agreements was to ensure that the Bank held the Plaintiffs' assets in such a way to ensure that the Plaintiffs received the tax-preferred status accorded to IRA accounts.  As the Bank points out, Section 408(a) of the Internal Revenue Code provides tax-advantaged treatments for certain IRAs "if the written governing instrument creating the trust" meets certain requirements, including that trust assets will not be commingled with other property.  See 26 U.S.C. § 408(a)(5) and 26 C.F.R. § 1.408-2(b)(5).  Further Form 5305 provides that the purpose of the form is "a model custodial account agreement that meets the requirements of Section 408A and has been automatically approved by the IRS."  [Dkt. #202, Ex. 8].  It further provides that a "Roth individual retirement account (ROTH) is established after the form is fully executed by both the individual depositor) and the custodian." *Id.* There is no evidence that the Bank's commingling of funds in contravention of IRS Form 5305's prohibition resulted in any negative tax treatment.  Therefore, the Plaintiffs have failed to establish they suffered any damages proximately caused by the alleged breach of that agreement.   In sum as this Court concluded in *Levinson*, it cannot discern any damages that would flow from the Bank's alleged conduct that would not be speculative.  As an essential element of a

21

breach of contract claim is establishing damages directly and proximately caused by the alleged breach, the Bank is entitled to summary judgment in its favor on this claim.[4]

     **ii.    Breach of Paragraph 3 of the Custodian Agreement**

     The Bank has moved for summary judgment on the Plaintiffs' claim that the Bank breached Paragraph 3 of the Custodian Agreement by failing to return their assets upon their request.  [Dkt. #191, Def. Mem., p. 12-13].  Paragraph 3 provides:

> The Bank will also follow such reasonable written directions which the Principal may deliver to the Bank at any time, or from time to time, including to request that BLMIS return assets of the Principal to the Bank and for the Bank to remit cash or cash equivalents to the Principal.

[Dkt. #184, Ex. A, ¶3].  The Bank argues that the Court has essentially addressed this very claim in *Levinson* when the Court examined whether the Bank breached Paragraph 7 of the Custodian Agreement by failing to return plaintiffs' assets and read Paragraph 7 in conjunction with Paragraph 3 to conclude that there was no breach.   The Bank advocates that the Court's rationale in *Levinson* is equally applicable here to Plaintiffs' claim under Paragraph 3. *Id.*

     In response, Plaintiffs clarify that their claim is again based on their theory that the Bank failed to transfer their contributions to BLMIS and instead used

---

[4] **The Plaintiffs have moved to preclude (although stylized as a motion to strike) as hearsay two pieces of evidence that the Bank submits in support of its claim that commingling was permissible under the Custodian Agreements.  The Court has denied that motion as moot as the Court neither relies on either set of documents in its determination that summary judgment is warranted on this claim.**

those funds to pay other customers' redemptions and fees.  [Dkt. #179, Pl. Mem., p. 25-26].  Plaintiffs assert that they made a written demand on the Bank on April 13, 2011 specifically requesting the return of the funds that WNB had not transmitted to BLMIS.  *Id.*  Plaintiffs essentially argue that because the Banks never sent the Plaintiffs' contributions to BLMIS but instead commingled those contributions and then used them to fund redemptions and fees, those funds were never stolen by Madoff.  *See* [Dkt. #179, Pl. Mem., p. 1] ("plaintiffs' contributions were, fortuitously, never sent to – or stolen by – Bernard Madoff:").  However as discussed above, those funds were in effect transferred to BLMIS when the Bank adjusted customers' *pro rata* share in the BLMIS account whenever a customer made contributions or sought redemptions.  Contrary to Plaintiffs' contention, Madoff clearly stole all of the Plaintiffs' contributions.  Plaintiffs' claim for breach of Paragraph 3 therefore necessarily fails because the Bank did transmit all available contributions to BLMIS, and therefore there are no funds that were never sent for the Bank to return.

To the extent that Plaintiffs' claim is not solely predicated on their theory seeking the return of the contributions they allege were never sent to Madoff, that claim would fail for the same reasons as the Court articulated in *Levinson*. *Levinson*, 2012 WL 4490432, at *11. The plain meaning of Paragraph 3 indicates that the Bank only had the obligation to request BLMIS to return the Plaintiffs' assets and then deliver the assets BLMIS returned on to the Plaintiffs.  It is undisputed that the Bank did follow the reasonable written directions of the Plaintiffs to request that BLMIS return their assets as WNB wrote to BLMIS

multiple times requesting the return of assets, and WNB has filed a claim in the BLMIS bankruptcy.  [CCB Local Rule 56(a)(1) Statement, ¶29].  Therefore the Bank has fulfilled its obligation under Paragraph 3 to effectuate the return of assets upon the reasonable written directions of the Plaintiffs.  For all of the above reasons, the Court grants summary judgment in favor of the Bank on the Plaintiffs' breach of Paragraph 3 claim.

### iii.    Failure to Take Custody

The Bank argues that it is entitled to summary judgment on Plaintiffs' breach of contract claim based on the Bank's failure to take custody of the investments BLMIS purported to make in the Bank's account at BLMIS.   [Dkt. #191, Def. Mem., p. 17].  The Bank argues that this theory was rejected in *Levinson* on the court's decision on the motion for judgment on the pleadings.  In that decision, the court held that the Custodian Agreement "makes no mention of holding account holders' assets in their Individual WNB accounts or transferring the funds to BLMIS for short-term trading purposes only; rather, the agreement states that, should an account holder seek remittances, he must instruct WNB to request that BLMIS return the account holder's assets to WNB" and therefore references to "assets" held by the Bank in paragraphs 4 and 5 "hav[e] nothing to do with how and where account holders' funds are invested." *Levinson*, 2010 WL 5477250, at *12.

In response, the Plaintiffs clarify that they do not contend that WNB was "necessarily required to take physical possession of the assets at BLMIS" but

rather by agreeing to "hold" their assets, the Bank "was required to do something to exercise proper custodial control over the assets at BLMIS – either by taking actual physical custody of the assets (as its account agreement with BLMIS allowed it to do) or if it chose to allow BLMIS to retain custodial responsibility by implementing appropriate controls to protect against risk of loss at BLMIS."  [Dkt. #219, Pl. Mem., p.8-9].  Plaintiffs argue that the Bank was required to perform some due diligence to verify the value of the Plaintiffs' account.  *Id.* at 12.   As the Bank points out, Plaintiffs' clarification of this theory reveals that their "failure to take custody theory" is duplicative of their second breach of contract theory alleging that BLMIS failed to employ proper controls which the Bank purposefully did not move for summary judgment on in light of the Court's decision in *Levinson*.   The Plaintiffs' theory is substantially similar to the *Levinson* Plaintiffs' theory that WNB failed to maintain adequate records and statements by not fulfilling its obligation to verify the information in the monthly statements BLMIS sent to the Bank.  As these claims are duplicative, the Court denies the Bank's request for summary judgment on this claim but notes that the Plaintiff has proffered one not two different breach of contract claims in connection with their claim that the Bank breached its contractual obligation to verify assets values and engage in some level of due diligence.  Therefore at trial, the Plaintiffs will be allowed to proceed only on this one theory.

### B.  Fiduciary Duty

The Bank argues that it is entitled to summary judgment on Plaintiffs' breach of fiduciary duty claims that are based on their breach of contract claims

for improper commingling of funds, failure to take custody and for breach of the IRS Form 5305 Agreements.  [Dkt. #191, Def. Mem., p.19-20].  The Bank argues that it was acting in solely a ministerial capacity and that it had no superior knowledge, skill or experience to support these particular breaches of fiduciary duty claims.  *Id.* at 20-21.  The Bank acknowledges that the Court in *Levinson* found that there were triable issues of fact in regards to plaintiffs' breach of fiduciary duty claims as to the calculation of fees and investment discretion.  *Id.* at 22-24.  The Bank argues that the Plaintiffs here have alleged a far broader fiduciary duty claim than in *Levinson,* which amounts to a claim that the Bank had the fiduciary duty to uncover Madoff's fraud.  *Id.* at 24.  In response, the Plaintiffs argue that the Bank's arguments have already been rejected by this Court in *Levinson* and they see no reason why a different conclusion is warranted.  [Dkt. #219, Pl. Mem., p. 19].  Plaintiffs seem to suggest that they are asserting the exact same breach of fiduciary duty claims as in *Levinson* and not a broader claim.  Plaintiffs state in their opposition memorandum that "these facts [in the present case] and the facts recited by the Court in *Levinson* [] are fully supported by the record here, and the conclusion should be the same."  *Id.* at 21 (citations omitted).

However, Plaintiffs then assert a broader breach of fiduciary duty claim related to their theory that the Bank misappropriated customer contributions to pay redemptions and fees and their claim that because of such conduct they were denied SIPA coverage.  The Plaintiffs argue that the Bank "in breach of its fiduciary duties, failed to place plaintiffs' interest above its own but rather – for its

26

own administrative convenience, and to maximize the profitability of its fee-based revenue – held plaintiffs' contributions in a commingled account rather than entrusting those assess to BLMIS…thereby depriving plaintiffs of SIPA coverage." *Id.* at 27.  Plaintiffs further argue that because the causation analysis on tort claims is different than for breach of contract claims, they are entitled to claim they suffered loss of SIPA coverage on their breach of fiduciary duty claim even though such a loss may not have been reasonably anticipated. *Id.* at 26-27. For the reasons discussed at length in connection with Plaintiffs' breach of contract claim premised on the same theories, Plaintiffs' broader breach of fiduciary duty claim fails.   Again due to the inherently fungible nature of cash, the Bank did transmit customer contributions on to BLMIS and therefore did entrust those assets to BLMIS.  Again, there is no admissible evidence that the Bank's conduct in commingling funds was the reason the Madoff Trustee denied the Plaintiffs' SIPA claims and further as there has been no final adjudication by the Bankruptcy Court of Plaintiffs' SIPA claims no damage has been suffered. Further to the extent that the Plaintiffs are arguing that the Bank had the fiduciary duty to uncover Madoff's fraud that theory has no basis in the factual record or in caselaw. *See Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 640 (2d Cir. 2012) (holding that plaintiffs' allegations that auditors of a fund which invested in BMLIS ignored red flags of Madoff's fraud and conducted an inadequate audit were insufficient to support an inference of scienter under securities law and finding that "the more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his

scheme and deceiving the SEC and other financial professionals.") (internal quotation marks and citations omitted). The Court therefore grants summary judgment in favor of the Bank on Plaintiffs' broader fiduciary duty claims.  To the extent that Plaintiffs' breach of fiduciary duty claims are duplicative of the claims already considered in *Levinson*, the Court's adopts its prior ruling in *Levinson* as to those claims.   *Levinson*, 2012 WL 4490432, at *16-19.

The Bank, in its reply brief in support of its motion for summary judgment, argues that a recent Connecticut Appellate court decision clarifies the law of fiduciary duty in Connecticut.  [Dkt. #238, Def. Mem., p.12].   The Bank argues that the recent decision in *Iacurci v. Sax*, 139 Conn. App. 386 (2012) makes clear that the Plaintiffs proffered evidence is insufficient as a matter of law to establish that the Bank owed the Plaintiffs any fiduciary duties at all.  The Bank suggests that the *Iacurci* decision should disrupt this Court's prior decision in *Levinson* holding that there were triable issues as to the alleged breach of fiduciary duty claim based on the Bank's investment discretion and its calculation of fees.  The *Iacurci* decision did not change the law of fiduciary duty in Connecticut.   Instead, the *Iacurci* court merely applied the well-established legal framework for examining fiduciary relationships, which this Court utilized in *Levinson,* to a distinguishable fact scenario.   The *Iacurci* court held that an accountant and accounting firm hired to prepare tax returns did not owe the client a fiduciary duty.  The court emphasized that the "law does not provide a bright line test for determining whether a fiduciary relationship exists, yet courts look to well established principles that are the hallmark of such relationships"  and the "court

has refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations…" *Id.*at 401 (internal quotation marks and citations omitted).   In coming to its conclusion, the *Iacurci* court emphasized that the plaintiff's allegations centered on the professional negligence of the accountant and accounting firm in their duty to prepare tax returns for the plaintiff and noted that professional negligence alone does not give rise automatically to a claim for breach of fiduciary duty. *Id.* at 401-02.  The court further explained that "[p]rofessional negligence implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty."  Id. at 402. (internal quotation marks and citations omitted).

In examining the particular relationship between the accounting firm and the plaintiff, the *Iacurci* court took notice of their engagement agreement, which provided only for the performance of a basic accounting function.  The engagement letter expressly provided that the accounting firm would prepare the plaintiff's tax return from information which the plaintiff was required to furnish and would not audit or otherwise verify the data the plaintiff submitted.  *Id.* at 403. The engagement letter emphasized that the plaintiff bore the burden of providing the required information for the preparation of the tax return and also had final responsibility for the income tax return.  *Id.*  The *Iacurci* court found that the evidence presented revealed that the accounting firm performed the duties outlined in the engagement letter by preparing the plaintiff's tax returns "on information provided by the plaintiffs and were filed with the plaintiff's final approval."  Further there was "no allegation, let alone evidence, that the

defendants were hired to, or were expected to, undertake tasks such as managing the plaintiff's funds, advising the plaintiff's personal or business affairs, but to prepare tax returns and provide advice concerning tax liability." *Id.* at 405. Consequently, the *Iacurci* court held there was "no evidence that the relationship between the parties was characterized by anything more than the usual interactions between an accountant hired to prepare annual tax returns and his or her client" and therefore there was no evidence that the relationship was characterized by a unique degree of trust or confidence. *Id.* at 405-06. Lastly, the court noted there was no evidence that the relationship afforded the defendants an opportunity to represent the plaintiff's interests to third parties or to abuse trust and confidence reposed in them by the plaintiff." *Id.*

Contrary to the Bank's contention, the nature of the relationship between the Bank and the Plaintiffs differs from the relationship the Connecticut Appellate court examined in *Iacurci*. In *Iacurci*, the accounting firm performed a basic accounting function in preparing plaintiff's tax return subject to the plaintiff's final approval based on information the plaintiff was required to provide which the accounting firm was expressly not required to audit or verify under the engagement agreement. In the present case, the Plaintiffs did not furnish any financial information to the Bank and had no ability to approve the financial statements which the Bank calculated based on information that BLMIS furnished. Moreover, this Court has held there are triable issues of fact as to the nature and scope of the Bank's contractual duty to conduct audits and whether that duty required it to assure the accuracy of the Plaintiff's account statements,

on which it calculated its fees, by auditing its own operations or whether it also required it to assure the accuracy of the BLMIS account statements by auditing BLMIS.  Further, the facts of the present case and in *Levinson* indicated that the Bank was not merely providing a basic accounting or record keeping function with respect to the calculation of fees and investment discretion.   As discussed in *Levinson*, the Bank without consulting the Plaintiffs, made the determination to liquidate investments in the BLMIS account, thus altering the allocation of Plaintiffs' proportionate investments between the clearing account and the omnibus account.  *Levinson*, 2012 WL 4490432, at *18.  In addition, WNB determined when to transfer money to BLMIS, without instructions from the Plaintiffs or BLMIS, in order to satisfy anticipated future cash needs.  *Id.*  Notably, when the OCC discovered these practices, it concluded that "[WNB's role] could be construed as evolving beyond being ministerial in nature."  *Id.*   Viewed in the light most favorable to the Plaintiffs, this evidence demonstrates that the Bank's conduct went beyond the merely ministerial like the tasks of preparing tax returns based on information provided by the plaintiff as was the case in  *Iacurci*.  Further considering that the Plaintiffs had no ability to interact directly with BLMIS regarding their investments, the Bank did represent the Plaintiffs' interests to third parties unlike the relationship in *Iacurci* as well as had the opportunity to abuse the trust and confidence the Plaintiffs reposed in them in dealing with BLMIS.  As the facts of *Iacurci* are clearly distinguishable, it does not disturb the Court's prior holding on fiduciary duty in *Levinson*.

## C.  Conversion and Statutory Theft

The Bank argues that it is entitled to summary judgment on the Plaintiffs' conversion and statutory theft claims because its administration of the accounts was authorized.  [Dkt. #191, Def. Mem., p.24-25].  The Bank also argues that the Plaintiffs cannot establish that it intended to wrongfully take their property to establish statutory theft.  *Id.* at 26-27.  Plaintiffs argue there are triable issues of fact as to whether the commingling of funds was authorized by the Custodian Agreement or IRS Form 5305 and therefore contend that summary judgment on their conversion and theft claim is inappropriate.  [Dkt. #219, Pl. Mem., p.29].  Plaintiffs explain that their conversion and theft claim is again predicated on their theory that the Bank did not transfer their contributions to BLMIS and instead used those funds to pay other customers' redemptions and fees.  *Id.*

"Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights ... It is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm." *Marut v. IndyMac Bank, FSB,* 132 Conn. App. 763, 768–69 (2012) (internal quotation mark and citations omitted).  To establish a claim of conversion, a plaintiff must establish "legal ownership or right to possession in the particular thing ... that the defendant is alleged to have converted." *Macomber v. Travelers Property & Casualty Corp.,* 261 Conn. 620, 650 (2002) (internal quotation mark and citations

omitted).  "The elements of civil theft are also largely the same as the elements to prove the tort of conversion, but theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." *Sullivan v. Delisa,* 101 Conn.App. 605, 620 (2007) (internal quotation marks and citations omitted).

As explained above, the Plaintiffs' claims for conversion and theft fail for the reason that the Bank did send customer contributions to BLMIS when it adjusted customers' *pro rata* shares in the BLMIS account.   Because cash is fungible, the Bank's conduct in adjusting its records to reflect the balance of that customer's contributions and redemptions instead of physically transferring funds to and from BLMIS did not result in the exercise of the right of ownership over the funds which deprived that customer of his or her funds permanently or for an indefinite period.   Contrary Plaintiffs' contention, the Bank did not take the funds belonging to one customer and give those funds to another to customer or apply them to the payment of custodial fees to the exclusion of the first customer's rights to those funds as Plaintiffs have not claimed that the customer's pro rata share of the BLMIS account was not adjusted to reflect the customer's contributions.   As noted above, if a customer had subsequently requested an amount equal to his prior contribution there is no evidence that the Bank would not have funded that request in view of the fact there is no evidence that BLMIS would have stopped funding redemptions requests prior to the unveiling of his scheme.

There could be no deprivation of those contributions because the Bank's adjustment of the customers' *pro rata* shares in the BLMIS account gave those customers a right of dominion over those funds within the BLMIS account. Again as cash is fungible, the fact that the Bank did not physically transfer the dollars and cents the customer deposited to BLMIS is immaterial. The Plaintiffs therefore cannot establish in light of the fungible nature of cash that the Bank exercised a right of ownership over their contributions to the exclusion of their rights which deprived them of their property permanently or for an indefinite period.  Therefore both Plaintiffs' conversion and statutory theft claims necessarily fail.  Again Plaintiffs' theory of conversion and statutory theft are simply incongruous with the fungible nature of cash and the concept of depository banking.  In addition, there is no evidence that the Bank had the requisite intent to deprive the Plaintiffs of their property to establish statutory theft.  The evidence demonstrates that it was Madoff and not the Bank who committed conversion and theft of *all* of the Plaintiffs' funds.  As there are no triable issues of fact as to whether the Bank exercised a right of ownership over Plaintiffs' funds to the exclusion of the Plaintiffs' rights which had the effect of depriving them of their funds, summary judgment in favor of the Bank is warranted on these claims.

### D.  CUTPA

The Bank argues that it is entitled to summary judgment on Plaintiffs' CUTPA claim as the Plaintiffs do not specify the laws or regulations they believe to have been violated by the Bank's conduct.  [Dkt. #191, Def. Mem. p.29-30].  The

Bank guesses that the Plaintiffs will rely on the CUTPA claims as alleged in *Levinson* and argue that they are entitled to summary judgment on the CUTPA claims that were asserted in *Levinson*. *Id.* In response, the Plaintiffs argue that the Bank "arbitrarily focuses attention on the issues of WNB's violations of IRS and OCC regulations pertaining to commingling and 'common fund investments,'" which were at issue in *Levinson*. [Dkt. #219, Pl. Mem. p. 46]. The Plaintiffs assert that their CUTPA claims are predicated on every single one of their other claims previously pled in their amended complaint such as their breach of contract, breach of fiduciary duty, conversion and theft claims as indicated by the fact that all their prior allegations were expressly incorporated into their CUTPA claim in the amended complaint. *Id.* at 46.

Contrary to the Plaintiffs' contention, the Bank's focus was not arbitrary as their CUTPA allegations in their amended complaint fail to satisfy Rule 8(a)(2) requirement that a complaint contain a "short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). This means that the complaint must "'give the defendant fair notice of what ... the claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). As the Bank points out, the Plaintiffs' CUTPA allegations fail to identify which acts of the Bank offend what public policy as established by which statutes or common law or other established concept of unfairness. [Dkt. #56, Amended Compl., ¶¶114-122]. Plaintiffs conclusorily allege that the Bank's conduct was "illegal, unscrupulous and immoral and violated the public policy of the State of Connecticut…was

undertaken in wanton, willful or reckless disregard of the law, standards of business morality and public policy, and with intent to injure plaintiffs." *Id.* The Plaintiffs further allege that there are entitled to rescission of their agreement with the Bank and restoration of the assets and cash transferred into their custodial accounts at the Bank. *Id.* at ¶121. Because the Bank had no notice of the grounds upon which Plaintiff's CUTPA claim(s) rested, the Bank was forced to guess those grounds and therefore did not arbitrarily chose to focus on the *Levinson* plaintiffs' CUTPA claims.

Here, the Plaintiffs' pleadings fail to allege even a formulaic recitation of the elements of a CUTPA claim and do not present any facts sufficient to fulfill them and put the Bank on notice on the ground(s) on which their CUTPA claim(s) rested. It is well established that "merely stating that the defendant's conduct violates public policy or is unfair and/or deceptive is not sufficient to sustain a CUTPA claim." *Priority Sales Management, Inc. v. Carla's Pasta, Inc.,* No.3:10–cv–1918 (CFS), 2011 WL 3819748, at *3 (D. Conn. Aug. 26, 2011) (internal quotation marks and citation omitted); see also *Daniel R. Kaufman, CPA, LLC v. Vertucci,* No.3:11cv912(WWE), 2011 WL 6001632, at *3 (D. Conn. Nov. 30, 2011) (holding that although "Plaintiff's CUTPA allegations mention Vertucci's use of an unregistered trade mark ... the complaint is devoid of facts supporting any violation of public policy as required for CUTPA").

Although Plaintiffs suggest they have satisfied Rule 8's notice pleading requirement by incorporating by reference their prior allegations into their CUTPA claim, it is well established that "[s]uch general allegations, without supporting

facts other than a clause incorporating an entire complaint by reference, are insufficient to withstand even a motion to dismiss because they do not give fair notice of what the claim is and the grounds upon which it rests." *Brandon v. City of N.Y.,* 705 F.Supp.2d 261, 268–69 (S.D.N.Y. 2010) (internal quotation marks and citations omitted); *Lastra v. Barnes and Nobles Bookstore*, No.11Civ.2173, 2012 WL 12876, at *7 (S.D.N.Y. Jan. 3, 2012) ("The Complaint, in providing a lengthy list without facts supporting each of the proffered claims, fails to give fair notice to the Defendants"); *Moore v. City of New York*, No.08-CV-2449, 2011 WL 795103, at *7 (E.D.N.Y. Feb. 28, 2011) (finding pleading to be insufficient under *Iqbal* because the "Plaintiff briefly states each cause of action in a conclusory manner and then appends a clause incorporating by reference all prior allegations in the complaint").

At best, the Plaintiffs' allegations in their CUTPA count can be construed to assert a CUTPA violation predicated on their breach of contract claims.  The Court will therefore consider Plaintiffs' argument that their breach of contract claims give rise to a CUTPA violation.  The Second Circuit as well as the vast majority of courts in Connecticut have held that a "simple breach of contract action is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy." *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1039 (2d Cir. 1995).  Connecticut courts have held that a "'[a] simple breach of contract, even if intentional, does

not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act....'" *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.,* 41 Conn.Supp. 575, 580, 595 A.2d 951, 954 (1991) (alteration in original) (quoting *Bartolomeo v. S.B. Thomas, Inc.,* 889 F.2d 530, 535 (4th Cir.1989) (discussing similar North Carolina unfair trade practices act)).  Connecticut courts have therefore permitted a CUTPA cause of action based on a breach of contract where there are aggravating circumstances attending the breach such as where there has generally "been some type of fraudulent behavior accompanying the breach or aggravating circumstances." *Pace v. North Haven Academy, LLC,* No. CV096005922S, 2010 WL 2108491, at *3 (Conn.Super.Ct. April 23, 2010). "Conduct that has been held to be substantial aggravating circumstances sufficient to support CUTPA claims includes fraudulent representations, fraudulent concealment, false claims ... and multiple breaches of contract." *Leonard v. Tabacco Const., LLC,* No. CV095014717, 2012 WL 2149402, at *6 (Conn.Super. May 10, 2012) (internal quotation marks and citations omitted).

Plaintiffs argue that they have demonstrated significant aggravating circumstances attending the breach of contract because the Bank has refused to perform under the contract while retaining the benefits of the contract.  [Dkt. #219, Pl. Mem. p.46]. However, this argument appears to assert nothing more than a simple breach of contract, which cannot support a CUTPA claim.   As will be discussed below, this Court has granted summary judgment in favor of the Bank on the Plaintiffs' claims for fraud as there is no evidence that the Bank engaged

38

in any fraudulent behavior in connection with its administration of the custodial accounts.  There is simply no evidence that the Bank's alleged breaches of contract were accompanied by some type of fraudulent behavior as is necessary under Connecticut law.  Moreover to the extent that the heart of the Plaintiffs' CUTPA claim is again premised on the Plaintiffs' misguided theory that the Bank deprived the Plaintiffs of their contributions by using them to pay off other customers' redemptions and fees instead of sending them onto BLMIS that claim fails for the reasons already discussed.  The Court therefore grants the summary judgment on the Plaintiffs' CUTPA claim in favor of the Bank.

The Court will not consider the other CUTPA claims that Plaintiffs advance for the first time in opposition to the Bank's motion for summary judgment as "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." *Thomas v. Egan,* 1 F. App'x 52, 54 (2d Cir.2001); *see also Greenidge v. Allstate Ins. Co.,* 446 F.3d 356, 361 (2d Cir.2006) (declining to reach merits of argument raised for first time in opposition to summary judgment); *Russo v. Keough's Turn of the River Hardware, LLC*, No.11CV994, 2012 WL 4466626, at *6 (S.D.N.Y. Sept. 25, 2012) ("It is well-settled that a court is not required to consider new theories of liability raised for the first time in opposition to summary judgment."); *Scott v. City of New York Dep't of Corr.,* 641 F.Supp.2d 211, 229 (S.D.N.Y. 2009) (explaining that facts and theories raised for the first time in opposition to summary judgment should not be considered in resolving a summary judgment motion), *aff'd,* 445 F. App'x 389 (2d Cir.2011); *Hughes v. McWilliams,* No. 04 Civ. 7030(KMW), 2009 WL 4823940, at *13 n. 6

(S.D.N.Y. Dec.15, 2009) (same).  As the Bank had no notice of these claims, it would be inappropriate to reach the merits of the Plaintiffs' arguments, which are raised for the first time in their opposition to summary judgment.

If the Plaintiffs were to seek leave to amend their CUTPA claims under Fed. R. Civ. P. 15(a)(2), it would likely be denied as "[l]eave to amend a complaint will generally be denied when the motion to amend is filed solely in an attempt to prevent the Court from granting ... summary judgment, particularly when the new claim could have been raised earlier." *Berman v. Parco,* 986 F.Supp. 195, 217 (S.D.N.Y. 1997).  It further appears futile to allow the Plaintiffs leave to amend the complaint as they have had both the knowledge of the need and the opportunity to do so and failed.  Further, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993).  The Second Circuit has "referred to the prejudice to the opposing party resulting from a proposed amendment as among the 'most important' reasons to deny leave to amend." *AEP Energy Servs. Gas Holding Co. v. Bank of American N.A.,* 626 F.3d 699, 725 (2d Cir.2010) (citation omitted). "Amendment may be prejudicial when, among other things, it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy,* 626 F.3d at 725–25 (internal quotation marks and citation omitted). Courts have typically found amendments to be prejudicial in circumstances where discovery has been completed and the case is near or on the eve of trial. *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,*

760 F.2d 442, 446 (2d Cir.1985) (affirming denial of motion to amend as
"especially prejudicial given the fact that discovery had been completed and [the
defendant] had already filed a motion for summary judgment"); *see also Krumme
v. WestPoint Stevens, Inc.,* 143 F.3d 71, 88 (2d Cir.1998) (same where "case was
near resolution and discovery had been completed"); *Juncewicz v. Patton,* No.
01–cv–0519E(SR), 2002 WL 31654957, at *6 (W.D.N.Y. Oct. 8, 2002) (denying leave
to amend leave to complaint on "eve of trial" as that would "unduly delay the final
disposition of this action").   Here, there would clearly be prejudice as discovery
had closed and the Bank has already filed summary judgment and granting leave
to amend would significantly delay the resolution of the litigation on what is the
eve of trial.   For the above reasons, the Court grants summary judgment in favor
of the Bank on the Plaintiffs' CUTPA claim.

### E.  Fraud

The Bank argues that it is entitled to summary judgment on Plaintiffs' fraud
claim because it did not falsely represent that it was holding, purchasing, and
selling shares of the Plaintiffs' interest in the BLMIS account when it was not.
[Dkt. #191, Def. Mem., p. 27].   The Bank guesses that the Plaintiffs' fraud claim is
based on their allegation that "WNB was aware that BLM 1 and BLM 2 did not
exist and that it was not holding any assets in plaintiffs' retirement accounts."  *Id.*
The Bank explains that when it became custodian it adopted the prior custodians'
record keeping designations for the custodial accounts.  Those "prior custodians
had tracked customer's proportionate ownership of the total assets invested with
BLMIS using the record keeping designation of 'share's of 'BLM 1' and 'BLM 2."

[Dkt. #191, Def. Mem., p. 5].   BLM 1 was the designation for pension plans while BLM 2 was for IRAs.  *Id.*  "The value of each 'share' of BLM 1 and BLM 2 was based on the reported balance of the BLMIS account plus the balance in the deposit accounts that WNB maintained to handle custodian account receipts and disbursements."  *Id.*  The Bank argues that to the extent that Plaintiffs' fraud claim is premised on the fact that "BLM 1 and BLM 2 did not actually have the values stated that was a function of BLMIS's misrepresentations in its account statements and confirmations to WNB.   WNB did not know that Madoff was fraudulently misrepresenting the value of the WNB account at BLMIS" and therefore "there is no evidence that WNB knew its own statements about the reported value of each plaintiff's account were misstated."  *Id.*

        In response, the Plaintiffs clarify that their fraud claim is predicated on several misrepresentations although not identified in the allegations under their fraud count and presumably based on their theory that they have incorporated by reference the entire complaint into their fraud count.  The allegations actually contained in Plaintiffs' fraud count are conclusory and devoid of any particularity. The Plaintiffs alleged that they relied on WNB's fraudulent statements in determining to establish and maintain retirement accounts at WNB and "in determination to make contributions to their retirement accounts, and in acquiescing in the fees charges and collected from their retirement account by WNB" and that "Defendant CCB is liable to plaintiffs for the financial losses plaintiffs…have sustained and other damages recoverable as a result of WNB's fraudulent statement and conduct."  [Dkt. #56, Amended Compl., ¶112].  Despite

having failed to give the Bank the required notice of the factual basis for their fraud claims and the Plaintiffs fail to concede this point, the Court will therefore examine each of the fraudulent statements that the Plaintiffs have now identified in their opposition to summary judgment memorandum.

"The essential elements of an action in common law fraud ... are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury ... Under a fraud claim of this type, the party to whom the false representation was made claims to have relied on that representation and to have suffered harm as a result of the reliance ." *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142 (2010) (internal quotation marks and citation omitted).  "In contrast to a negligent representation, [a] fraudulent representation ... is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it. This is so because fraudulent misrepresentation is an intentional tort." *Id.* (Internal quotation marks and citations omitted.).  "The absence of any element of a claim of fraud is fatal to the plaintiff's recovery." *Capp Indus., Inc. v. Schoenberg*, 104 Conn. App. 101, 117 (2007).

First, the Plaintiffs argue that the Bank made "false representations as to how it would administer plaintiffs' accounts and hold plaintiffs' funds which it had no intention of complying with at the time it made them."  [Dkt. 219, Pl. Mem., p. 35-36].  Plaintiffs argue that the Bank represented that it would send their contributions to BLMIS for investment and would not commingle their funds, but

instead was holding their funds in a commingled account and using their funds to pay other customers' fees and redemptions.  *Id.* at 36, 38.  Second, the Plaintiffs argue that the Bank made "false representations in its annual statements to plaintiffs between 1999 and 2008 about the holdings and activity in their accounts."  *Id.*  Plaintiffs posit that WNB falsely represented that it was buying shares of BLM 1 or 2 with new contributions and selling such shares to pay fees when in reality "BLM 1 and BLM 2 were merely bookkeeping designations and were not equities held by WNB and had no 'market value.'"  *Id.*

These purported fraudulent misrepresentations are predicated on the Plaintiffs' misguided theory that the Bank deprived the Plaintiffs of their contributions by using them to pay off other customers' redemptions and fees instead of sending them onto BLMIS.  For the reasons already discussed at length the Bank did transmit the Plaintiffs' contributions to the BLMIS account and the effect of their adjustment of such bookkeeping designations was the sell and purchase of BLM shares in response to customer contributions and redemptions.  Therefore there is no evidence that the Bank's representation that all contributions would be invested in BLMIS was not untrue or known to be untrue.  Further as the Bank points out there is no evidence that the Bank was aware of Madoff's fraud and therefore did not know that the account statements provided by BLMIS were fictitious. Consequently, the Bank's statements as to the value of BLM 1 and 2 shares were not untrue or known to be untrue.  With respect to Plaintiffs' fraud claim based on the Bank's improper commingling of funds, as discussed in *Levinson* it is ambiguous whether commingling was permitted

under the custodian agreements.  As it is unclear whether the Bank's conduct in commingling funds and administering the custodial accounts as it did was impermissible under the custodian agreements, and as the Plaintiffs have offered no evidence to establish that the alleged fraudulent misrepresentation was untrue, known to be untrue by the Bank and made by the Bank to induce the Plaintiffs to enter into and maintain the custodial relationship, Plaintiffs have failed to sustain their burden of showing that that there exists a genuine issue of material fact that the Bank committed fraud.  Finally, as fraudulent misrepresentation is an intentional tort, a legitimate disagreement as to the interpretation of a contract cannot support a claim of fraud and therefore summary judgment in favor of the Bank is appropriate.

Lastly, the Plaintiffs argue that the Bank engaged in "continuing misrepresentations – even after Madoff's fraud was discovered – regarding the cash value of the plaintiffs' account."  [Dkt. #219, Pl. Mem, p. 37].   Plaintiffs posit that the Bank "issued false account statements that failed to disclose the cash CCB was holding in relation to those accounts and failed to comply with its obligation in 2009 and thereafter to provide plaintiffs with annual IRS forms that would have reflected the cash allocable to each account for each plaintiff."  *Id.* The Plaintiffs contend that the Bank "has admitted that it issued annual account statement for 2007 year end that intentionally omitted reference to the cash being held at WNB on plaintiffs' behalf and intentionally omitted a statement of each account's year end market value, and that it intentionally did not send copies of the annual forms filed with the IRS (stating each IRA's market value) to plaintiffs

45

for 2008." *Id.* The Plaintiffs further argue that these "acts of fraud and omission had the effect of concealing plaintiffs' claims against WNB for its improper management of their custodial accounts. " *Id.* Plaintiffs also argue that post-2008, the Bank concealed the fact that cash, which had never been sent to BLMIS remained in WNB"s deposit account following the discovery of Madoff's fraud. *Id.* at 43.

As the Bank emphasizes, nowhere in the Plaintiffs' amended complaint are there any allegations that the Bank committed fraud after Madoff's arrest and it would therefore be inappropriate to consider such an entirely new claim raised for the first time in opposition to summary judgment. *Scott,* 641 F. Supp. 2d at 229. The Bank contends that even if the Court considered such a new claim there is no evidence of concealment as the Bank produced records of its transfers to and from BLMIS to the Plaintiffs' counsel. [Dkt. #238, Def. Mem., p.26]. Moreover, even if the Bank was guilty of such "concealments" post-2008, the Plaintiffs have failed to submit any evidence that the Bank's alleged acts or omissions were made to induce the Plaintiffs to act upon them or that the Plaintiffs did so act upon them to their injury. Plaintiffs summarily assert that the Bank's acts of fraud and omission concealed their claims against WNB for its improper management of the custodial accounts. However that assertion is unpersuasive as the Plaintiffs successfully instigated the pending action bringing numerous claims against the Bank for its alleged improper management of the custodial accounts. As there is no evidence that the Bank's post 2008 alleged acts or omissions were made to induce the Plaintiffs to act upon it nor is there

any evidence that the Plaintiffs acted upon those false representations to their injury, summary judgment in favor of the Bank would have been warranted had the claim been made.

F.   Unjust Enrichment

The Bank argues that that Plaintiffs' unjust enrichment claim fails because there is no evidence that the Bank was benefited when the Bank allegedly did not deliver the Plaintiffs' contributions to BLMIS and instead used those funds to pay other customers' redemptions and fees.  [Dkt. #191, Def. Mem., p.35-37].  In response, the Plaintiffs argue that just like in *Levinson* the Bank was unjustly enriched by receiving custodial fees.  [Dkt. #219, Pl. Mem., p.58].  The Plaintiffs further argue that the Bank was benefited because it used the Plaintiffs' contributions to pay its own fees.  *Id.*  The Bank rightly points out that the Plaintiffs' alleged unjust enrichment claim is entirely different than the unjust enrichment claim that was alleged and considered by the Court in *Levinson*.  In *Levinson*, the unjust enrichment claim was predicated on the Bank's allegedly erroneous calculation of fees.  *Levinson*, 2012 WL 4490432, at *24-25.  Here the Plaintiffs' claim is again predicated on their misguided theory that the Bank deprived the Plaintiffs of their contributions by using them to pay off other customers' redemptions and fees.  In their amended complaint, the Plaintiffs have solely alleged in their unjust enrichment claim that the Bank "did not deliver [Plaintiffs'] funds to BLMIS, but instead wrongly retained possession and use of said funds" and "[a]s a result of defendant WNB's wrongful conduct in retaining possession of said funds, defendant WNB has received the financial benefits of

47

said funds at the expense of said plaintiffs." [Dkt. #56, Amended Compl., ¶¶33-35]. The Plaintiffs further allege that the Bank "has been and will be unjustly enriched as a result of receiving, retaining and using the post-January 2000 funds, to the financial detriment of said Plaintiffs." *Id.* at ¶37.

This claim fails for the reasons already discussed because the Bank did perform custodial services, including transferring the Plaintiffs' contributions to BLMIS physically by adjusting Plaintiffs' *pro rata* shares of the BLMIS accounts, investing funds in money market accounts pending disbursements, and preparing and submitting customer account statements and tax forms. Plaintiffs do not contend nor have they produced any evidence tending to show that the Bank was aware that BMLIS was perpetrating a Ponzi scheme and thus the reported account balances were false. Therefore, Plaintiffs have also failed to show that the custodial fees calculated and collected by the Bank, otherwise in accordance with the terms of the custodian agreements, was fraudulent. Accordingly, there is no evidence that the Bank wrongfully retained possession of the Plaintiffs' contributions to their financial detriment and were thereby benefitted from such possession. The Bank is therefore entitled to summary judgment in its favor on the Plaintiffs' unjust enrichment claim. As the Plaintiffs have brought an entirely different unjust enrichment claim than was brought in *Levinson*, the Court agrees that the *Levinson* decision is inapplicable here. Further, it would be inappropriate to allow Plaintiffs to proceed on the theory of unjust enrichment that was proffered in *Levinson* as it is "[i]t is well-settled that a court is not required to consider new theories of liability raised for the first time

in opposition to summary judgment." *Russo,* 2012 WL 4466626, at *6.  Lastly, the Court would not likely grant leave to amend the Plaintiffs' unjust enrichment claim at this late stage in the litigation for the reasons discussed above.

### G. Negligence

The Bank argues that it is entitled to summary judgment on Plaintiffs' negligence claims to the extent they are premised on Plaintiffs' claim that the Bank was negligent in not preventing commingling, not taking custody of the investments BLMIS purported to make, and not accurately reporting fair market value to IRS for the same reasons those breach of contract claims failed.  [Dkt. #191, Def. Mem., p. 35].  The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Pelletier v. Sordoni / Skanska Constr. Co.*, 286 Conn. 563, 593 (2008).  The Plaintiffs have clarified that their failure to take custody claim and failure to report fair market value claim is really duplicative of their claim that BLMIS failed to employ proper controls and therefore this claim is substantially identical to the *Levinson* plaintiffs' negligence claim that the Bank owed the Plaintiffs a duty to monitor, verify and audit their investments with BLMIS.  For the reasons discussed in *Levinson*, there are triable issues of fact as to whether the standard of care in these circumstances included monitoring, verifying, or auditing the Plaintiffs' investments with BMLIS.   In accord with the *Levinson* decision, the Plaintiffs may proceed on this one theory of negligence at trial.  *Levinson*, 2012 WL 4490432, at *19-20.  With respect to the Plaintiffs' negligence claim predicated on their commingling breach of contract theory, the Plaintiffs argue this claim

survives summary judgment because the law of torts differs from the law of contracts with respect to the applicable causation standard for awarding damages in that under tort law plaintiffs can recover damages proximately caused by a defendant's negligence even if the consequences were not reasonably anticipated.  [Dkt. #219, Pl. Mem., p. 57-58].  Again Plaintiffs point to the loss of SIPA coverage as their damage that was proximately caused by the Bank's negligence in commingling funds.  As previously discussed, there is no evidence that the Plaintiffs suffered any damages at all, including the loss of SIPA coverage, from the Bank's practice of commingling funds.  As causation and actual injury are essential elements of a negligence claim, the Bank is entitled to summary judgment in its favor on this negligence claim.

### H.  The Bank's Eighth Affirmative Defense – Unjust Enrichment

The Plaintiffs argue that they are entitled to summary judgment on the Bank's Eighth Affirmative Defense of unjust enrichment.  The Bank's affirmative defense is predicated on the event that the Plaintiffs are able to recover the Bank's custodial fees, PSCC's recordkeeping and administrative fees, and/or the funds the Plaintiffs' contributed to their accounts.  The Bank argues to the extent Plaintiffs are able to recover those damages they would be "unjustly enriched and it would be contrary to equity and good conscience to permit the plaintiffs to recover those fees and/or funds without reducing those fees and/or funds by the value of the services the plaintiffs received by WNB and PSCC."  [Dkt. #216, Def. Mem., p.43].

"Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282–83 (1994). "Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to a contract." *Russell v. Russell,* 91 Conn.App. 619, 637, cert. denied, 276 Conn. 924, 888 A.2d 92 (2005) (Internal quotation marks and citation omitted.).  Therefore a "right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to *retain a benefit* which has come to him at the expense of another." *Gagne v. Vaccaro*, 255 Conn. 390, 408 (2001) (internal quotation marks and citations omitted).  "With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard . . . Unjust enrichment is a very broad and flexible equitable doctrine that has its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff." *Id.* at 408-09.

The Plaintiffs argue that because the parties have entered into an express contract as to Bank's fees that would preclude a claim for unjust enrichment as there is a remedy available pursuant to a contract.  The Bank argues that although the Custodian Agreement provided for the payment of fees it did not

address this unprecedented situation and therefore the express contract did not speak to this particular situation.   As the Bank argues "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Town* of *New Hartford v. Conn. Res. Recovery Auth.,* 291 Conn. 433, 454 (2009); see *also Rent-A-PC, Inc. v. Rental Management, Inc.,* 96 Conn. App. 600, 606 (2006) ("the existence of a contract, in itself, does not preclude equitable relief *which is not inconsistent with the contract")* (emphasis in original).  A claim of unjust enrichment embodies the quintessential equitable considerations designed to further the ends of justice.   Here the Custodian Agreement clearly did not contemplate the recovery of fund and fees paid in a litigation as result of the perpetration of a Ponzi scheme in which both contracting parties had been defrauded by a third party.  It would therefore be permissible to consider such an equitable claim despite the existence of an express contract.

The Plaintiffs also argue that the fact that the contract did not contemplate the effect of Madoff's Ponzi scheme is irrelevant as the parties expressly contracted for the payment of fees based on the actual assets in the BLMIS accounts, which were zero and therefore there is no equitable basis for the Bank to retain the value of the services it provided.  [Dkt. #237, Pl. Mem., p. 15].  The Plaintiffs point to the testimony elicited in an entirely different case in Connecticut Superior Court that the Bank's corporate designee interpreted the Custodian Agreement to provide for fees calculated by actual assets.  *Id.*  The Plaintiffs argue that this testimony definitively answers the question of whether

the contract contemplated fees based on actual or reported assets.  However, the Court does not find such testimony to be dispositive as to the intent of the parties who drafted the agreement.   At best such testimony further bolster this Court's prior conclusion in *Levinson* that there are triable issues of fact as to whether the fees were to be based on actual or reported assets under the Custodian Agreements.  *Levinson*, 2012 WL 4490432, at *12-13.  Moreover even if the fees were to be calculated on the basis of actual assets that subject would still not fully address the scenario of the recovery of fees and funds in the event of litigation between the parties which the Bank's unjust enrichment affirmative defense is premised.  In view of that summary judgment is inappropriate on the Bank's eighth affirmative defense.

Lastly, the Plaintiffs argue that WNB and PSCC have been paid all fees that they were owed for their services under the Custodian Agreements and to allow them to offset the purported value of the services rendered would result in a windfall of double the custodial fees they were entitled to receive.  [Dkt. #179, Pl. Mem., p.45].  This argument is misplaced as the Bank's claim for recovery of the value of the services rendered is contingent on the Plaintiffs' successfully obtaining a reward recovering from the Bank all the fees it previously received under the Custodian Agreement.  Therefore there would be no double windfall as the Bank would have disgorged whatever fees it made back to the Plaintiffs in such a scenario.

As discussed in the Court's decision in *Levinson* denying the Bank leave to amend its answer, the Bank's theory in its affirmative defense may be more

53

appropriately construed as one for a credit against any future recovery or a remittitur against any future verdict.  *See* 2012 WL4490534, at *4.  Such a damages argument need not be pleaded and may be raised during and after in the form of a remittitur or a request for a credit against amounts already paid.  *Id.*

### I.  The Bank's First Counterclaim – Unjust Enrichment

The Plaintiffs have also moved for summary judgment as to the Bank's first counterclaim of unjust enrichment.  The Bank's counterclaim is based on their contention that certain Plaintiffs, who they term "Net Winners" (meaning those that withdrew more money from their custodial accounts than they deposited), would be unjustly enriched at the expense of the Bank if they were to prevail on their claims they are entitled to recoup the contributions they made.  [Dkt. #182, Pl. Mem., p. 1].  The Plaintiffs highlight that in *Levinson* the Court denied the Bank leave to amend its answer to assert a substantially identical counterclaim on the ground that such amendment would be futile.  *Id.* at 8.   In response, the Bank clarifies that its counterclaim applies only if the Plaintiffs succeed on their "commingling" breach of contract claim and recover from the Bank the contributions they made into their custodial accounts while WNB was custodian. [Dkt. #209, Def. Mem., p. 1].  The Bank indicates that if the Court follows its summary judgment ruling in *Levinson* and grants summary judgment in its favor on that claim, then Plaintiffs' motion seeking summary judgment will be moot.  *Id.* at 2.   As this Court has followed its ruling in *Levinson* and granted summary judgment in favor of the Bank on Plaintiffs' "commingling" breach of contract claims, the Bank's counterclaim has been in effect dismissed.  Because the

Bank's has clarified that its counterclaim is solely predicated on the Plaintiffs' "commingling" breach of contract claims, the Court denies Plaintiffs' motion for summary judgment as moot.

### J. Remaining arguments

The Plaintiffs argue that the Bank's defenses as to liability do not preclude the granting of their motion for summary judgment. [Dkt. #179, Pl. Mem., p.27-29]. The Plaintiffs also argue that they are entitled to an entry of orders awarding them the amount of their contributions to their accounts with prejudgment interest from April 23, 2011. *Id.* at 30. However as the Court has denied Plaintiffs' motion for summary judgment on other grounds, the Court need not address these arguments. Further as the Court held in *Levinson* the question of Plaintiffs' entitlement to prejudgment interest is premature at this juncture and can reasserted after trial has concluded. *Levinson*, 2012 WL 4490432, at *30 n.1.

The Bank reiterates its prior arguments that were already considered by the Court in *Levinson* that the economic loss doctrine bars Plaintiffs' tort claim. In *Levinson*, the Court concluded that the economic loss rule did not bar the Plaintiffs' tort claims, noting the split of authority as to the circumstances in which it applies. *Levinson*, 2012 WL 4490432, at *28. The Bank argues that the Court must predict how the Connecticut Supreme Court would rule and determine whether and to what extent the doctrine applies to the present scenario now prior to trial. [Dkt. #191, Def. Men. P. 36-37]. The Court is disinclined to conclude that the economic loss doctrine bars the Plaintiffs' tort claims considering that part of

the Connecticut Supreme Court's reasoning was the sophistication and equal bargaining position of the parties to the contract in that case. *Flagg Energy Development Corp. v. General Motors Corp.* 244 Conn. 126 (1998). Considering that Connecticut law has long permitted contract and tort claims to coexist and that the Plaintiffs have produced sufficient evidence of liability and damages to maintain separate contract and tort claims at this point, the Court reaffirms its prior determination in *Levinson* that it would be inappropriate to restrict Plaintiffs to just their contract remedies at this point.   Moreover, the question of whether the economic loss doctrine applies to bar Plaintiffs' tort claims might be moot after trial in the event that the Plaintiffs are not able to recover on both their contract and tort claims.  The decision to decline consideration of this issue at this juncture comports with the Court's broad discretion to manage its docket in furtherance of "[w]ise judicial administration" and "conservation of judicial resources."  *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952); *see also Elgin v. Dept. of Treasury*, 132 S. Ct. 2126, 2147 (2012) ("District courts have broad discretion to manage their dockets, including the power to refrain from reviewing a constitutional claim pending adjudication of a nonconstitutional claim that might moot the case").

Lastly, the Bank has filed a motion *in limine* seeking to exclude from the summary judgment record and from trial improper opinion given by the Plaintiffs' proffered industry expert, Steven L. Henning.   As this Court has not relied on Henning's expert testimony in its summary judgment decision, the Plaintiffs' motion *in limine* seeking to exclude such evidence from the summary judgment

record is moot.  The Court will just consider the Bank's motion *in limine* with respect to their request to exclude his testimony at trial.

## Conclusion

As stated and for the reasons articulated above, the Plaintiffs' motion for partial summary judgment [Dkt. # 178] is DENIED and the Plaintiffs' motion for partial summary judgment as to Defendant's first counterclaim [Dkt. #181] is DENIED AS MOOT.   The Bank's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.

The following claims remain extant for trial: (i) breach of contract based on the Bank's calculation of fees based on "assets"; (ii) breach of contract based on the Bank's failure to maintain adequate records and statements; (iii) breach of fiduciary duty based on the Bank's exercise of investment discretion; (iv) breach of fiduciary duty centered on the Bank's calculation of fees; (v) negligence claim based on the Bank's duty to monitor, verify or audit the Plaintiffs' investments in BLMIS; and the Bank's eighth affirmative defense of unjust enrichment.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 26, 2013